Pages 1 - 44

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Edward M. Chen, Judge

MEDICAL DIAGNOSITC )
LABORATORIES, LLC, )
                     )
          Plaintiff, )
                     )
   VS. )      **NO. CV 17-05572-EMC**
                     )
PROTAGONIST THERAPEUTICS, )
INC., )
                     )
          Defendant. )
                     )

San Francisco, California
Friday, January 19, 2018

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiff:

OBLON, MCCLELLAND, MAIER & NEUSTADT,
LLP
1940 Duke Street
Alexandria, VA  22314
**BY:  ERIC W. SCHWEIBENZ, ESQUIRE**
**VINCENT K. SHIER, PH.D., ESUIRE**

PILLSBURY WINTHROP SHAW PITTMAN LLP
Four Embarcadero Center - 22nd Floor
San Francisco, CA  94111
**BY:  CHRISTOPHER STRETCH, ESQUIRE**

PILLSBURY WINTHROP SHAW PITTMAN LLP
725 S. Figueroa Street - Suite 2800
Los Angeles, CA  90017
**BY:  JEFFREY D. WEXLER, ESQUIRE**

Reported By:        Pamela A. Batalo, CSR No. 3593, RMR, FCRR
                       Official Reporter

APPEARANCES CONTINUED:


For Defendant:

                    COOLEY LLP
                    3175 Hanover Street
                    Palo Alto, CA  94304
           **BY:  MICHELLE S.RHYU, PH.D., ESQUIRE**
                **LAUREN J. KRICKL, ESQUIRE**

**Friday - January 19, 2018**                              **11:55 a.m.**

# P R O C E E D I N G S

## ---oOo---

THE CLERK:  Calling CV 17-5572, Medical Diagnostic Laboratories, LLC v.s Protagonist Therapeutics, Inc.

Counsel, please come to the podium and say your name for the record.

MS. RHYU:  Good morning, Your Honor.  Michelle Rhyu on behalf of defendant Protagonist.

THE COURT:  Good morning, Ms. Rhyu.

MR. STRETCH:  Good morning, Your Honor.  Christopher Stretch from Pillsbury Winthrop on behalf of Medical Diagnostic Laboratories.

With the Court's permission, may I introduce my colleagues?

THE COURT:  Certainly.

MR. STRETCH:  This is Eric Schweibenz from the Oblon firm, who will be handling today's festivities.  Vincent Schier, also from Oblon, and Jeff Wexler from Pillsbury.

THE COURT:  All right.  Welcome.

MS. RHYU:  May I also introduce my associate, Lauren Krickel from the Cooley firm as well.  This is her first time at counsel table.

THE COURT:  Good.  Will she get to argue?  You know our policies around here.  So I certainly would welcome the

opportunity, if she wants to participate in some way.

**MS. RHYU:**  We will keep that in mind, yes.

**THE COURT:**  All right.

The issue here is whether there is something outside the scope of the safe harbor that's been alleged here, and as I understand the Janssen Agreement, it provides for participation and funding, most immediately towards development of the drug and getting through clinical trials, etc., etc., and there is substantial funding for that and participation.  So a lot of that clearly falls, I think, within the safe harbor.

The question is whether there is something in addition that is ripe that falls outside the safe harbor.  It does anticipate that if there is a successful -- the clinical trials are successful and FDA approval is obtained, the parties then go into an actual sales marketing phase, and there appears to be some provision about that and money, not an insignificant amount of money paid in connection with that.  But that is quite conditional at this point because you have to get through Phase 1, Phase 2, and final approval by the FDA; otherwise, there is nothing to market, nothing to sell if the FDA says no. And there is kind of an opt-in -- Janssen has got to decide that it wants to do this.

And so given those contingencies and the fact that there is nothing to sell at this point, it seems to me there is a ripeness question about that part of the contract.  So we have

sort of -- from what I understand, sort of two aspects of the agreement.  One is the development stage and the monies and the participation and the exchange consideration therefor which seems to fall clearly within safe harbor.

The part that doesn't fall within safe harbor, which is the actual making the money, selling the product, marketing, etc., which is sort of post-approval process is somewhat speculative and conditioned on a number of conditions and therefore of doubtful ripeness.  That's the argument.  And I will say that I find that generally persuasive.

So my first question is what sale, what action do you contend is taken here that is not reasonably related, at least within the meaning of the *Merck* case, to the safe harbor zone?

**MR. SCHWEIBENZ:**  Your Honor, if I may, I promise I will answer that, but I think I can make this much easier than looking at the Janssen Agreement because there is multiple allegations that we made in the Complaint, Your Honor.

If I may, Your Honor, I have a copy of the *Merck* case that I brought up with me, and I would like to pass it up to Your Honor with a highlighted page.

It wasn't specifically pointed out by counsel for Protagonist, but what you will see there at pages spanning 205 and 206, it actually supports the position that we are taking here in the Complaint, which it says specifically -- this is what Judge Scalia said.  First he said he doesn't quibble with

the Federal Circuit statement from below.  "The safe harbor exemption does not globally embrace all experimental activity that at some point, however attenuated, may lead to an FDA approval process."

Then you look at the very next sentence -- that's the one we have highlighted spanning pages 205 to 206, and Judge Scalia gives two examples.  He says, "Basic scientific research on a particular compound performed without the intent to develop a particular drug or a reasonable belief that the compound will cause the sort of physiological effect the researcher intends to induce is surely not reasonably related to the development and submission of information to the FDA."

Now, that's really critical, Your Honor, because from our perspective, in order to defect Protagonist's motion here, it's only necessary to focus on the making and using infringement allegations that are set forth in our Complaint.

So specifically, Your Honor, and as noted in our opposition brief, the Complaint provides a detailed timeline of relevant events that occurred.  They started with -- and this is really critical, Your Honor, to understand our case here.

The issuance of the '150 patent on February 3 of 2015 -- that's a critical date, Your Honor.  Then we have contact from Protagonist's counsel two days later on February 5, 2015.  Then the parties had their first telephonic meeting that took place after they -- the defendant was provided with our confidential

information pursuant to an NDA regarding our technology.

Less than two months later, Your Honor, they filed an application, the one that led to their '268 patent, and it's directed to the IL-23 peptides.

Later, as you know, Your Honor, those negotiations were unsuccessful and they ended on October 13, 2015.  So our infringement allegations here, Your Honor, are related to the '150 patent as it relates to the unlawful making and using of IL-23 peptides after the issuance of the patent on February 3, 2015 and before Protagonist commenced any pre-clinical activities relating to PTG-200.

THE COURT:  So what is the infringing act?

MR. SCHWEIBENZ:  It's making and using, Your Honor.

THE COURT:  What is it here?  What is the actual infringing act?  And show me where in the Complaint.

MR. SCHWEIBENZ:  Sure, Your Honor.  That's listed at -- specifically, Your Honor, you can look at paragraphs 43 and 51 of the Complaint.

THE COURT:  43.

MR. SCHWEIBENZ:  I think 51 is probably the one I would point to.

THE COURT:  43 says specifically, "Protagonist has made, used, sold or offered for sale to Janssen the polypeptides that inhibit the binding," etc., etc.  So that seems to be tied to Janssen.

**MR. SCHWEIBENZ:**  Your Honor, I will point you to 51. We say that, "They have infringed the '150 patent in violation of '271 either literally under the Doctrine of Equivalents by, among other things, making, using, offering for sale, under selling it to the United States without authorization, unlicensed products in a manner that infringes at least claims 1, 2, 10, 12 and 15 through 17 of the '150 patent," Your Honor. Those are separate allegations --

**THE COURT:**  Okay.  Well, specifically "Protagonist directly infringes the '150 patent by making, using, selling and/or offering to sell the PTG-200."

Well, but that's pretty conclusory.  The only reference to *making, using or selling* seems to me to be in conjunction with the Janssen, because you incorporate by reference, and if you look at paragraph 48, it quotes the terms of the Janssen agreement.  If you look at paragraph 49, regardless of whether Janssen or some other pharmaceutical company eventually take actions, the commercial transactions themselves are not reasonably related.

But I don't know what else is there besides the anticipated commercialization with Janssen?  Is there -- what else is alleged in here?

**MR. SCHWEIBENZ:**  Your Honor, we have the exhibits to the Complaint, and we have, for example, Complaint Exhibit E, which is a copy of the -- Your Honor, I want to get out a

little bit more, if I could, as it relates to our allegations of making and using, which is, if you look at Exhibit E, which is there patent, there is listed there examples of 1 through 8 at columns 108 to 221.  And they detail numerous experiments and testing that were conducted in the United States based on our technology.

So, Your Honor --

THE COURT:  Well, testing for what purpose?

MR. SCHWEIBENZ:  In our opinion, Your Honor, this goes to what was in the *Merck* case, that we think it was basic scientific search, and when I put that in context, Your Honor --

THE COURT:  Well, it's got to be scientific research, either without the intent to develop a particular drug that is going to be submitted for approval, or without a reasonable belief that it's going to cause a physiological effect.  There is no doubt about the second one.  The whole purpose is to have a physiological effect.  So I don't see how that comes into play.

MR. SCHWEIBENZ:  Actually, that is the one we think is in play, Your Honor.  If I could direct you to --

THE COURT:  How?

MR. SCHWEIBENZ:  I would hand up, Your Honor, Exhibit G, a portion of it, from our Complaint.

What this is, Your Honor, is it's a PowerPoint

presentation that Protagonist released, and what they do in that PowerPoint slide, Your Honor, is they're identifying, okay, a time period before pre-clinical.  In other words, they're saying that we were leading -- we were doing research.  That's a time period.  They define the research period.  Then they say there is pre-clinical.  And what were they doing?  They were testing thousands of peptides.  Thousands of peptides.  That's what they were doing in that time period.  And that was before -- their words, not ours -- that was before any pre-clinical activities took place.

THE COURT:  And *Merck* says what is covered necessarily includes pre-clinical studies of patented compounds that are appropriate to submission to the FDA in the regulatory process.  So you have got to have some predicate work done before you get to the clinical stage.

MR. SCHWEIBENZ:  But we're saying --

THE COURT:  So what --

MR. SCHWEIBENZ:  I apologize, Your Honor.

THE COURT:  So what that it's pre-clinical?  That doesn't automatically take it outside the safe harbor provision.

MR. SCHWEIBENZ:  But we are saying pre-pre-clinical.

THE COURT:  Where does it say that?  This says pre-clinical.  I don't see two *pre's*.

MR. SCHWEIBENZ:  I see on the slide, Your Honor, they

are defining a time period of discovery that led them to pre-clinical in which they conducted tests on thousands of peptides.

Your Honor, the reason this is important is when you put this in the context of our timeline, our argument is that they didn't know what they had until they talked to my client.  Then they -- and let me, Your Honor -- the best evidence perhaps, other than what I've already given you, is when you look at their July 17, 2014 provisional.  They refer to it in their reply brief.  They said we already had an application on file, Your Honor.  But that was a placeholder, what we call in patent law a provisional application.

And guess what, Your Honor, in that provisional application that was filed on July 17, 2014, there was only 359 sequences in that application, Your Honor.  Then they met with my client.  You know, then they filed this new application less than two months later, and lo and behold, Your Honor, after receiving our confidential information, their new application, which is the '268 patent, had 1,114 sequences or more than three times as many sequences than what was originally set forth in their provisional application, their placeholder application, that was filed before the meeting with my client.

All we're saying, Your Honor, is that it's a plausible claim of relief under *Merck* that within this very limited time period, they were conducting, by their own admission --

conducting research before they got to the pre-clinical stage, which is exactly --

THE COURT:  So taking very fundamental research, sort of stealing your idea and your patent, using that in their -- their application for the '268, constitutes unprotected infringement because it's too early in the process, it's not even -- it's not proximate enough to the FDA process?

MR. SCHWEIBENZ:  That's -- that's exactly how --

THE COURT:  So where would you draw the line if you're a court -- it's clear that pre-clinical studies of patented compounds can be covered.  Where do you draw the line between what's protected by safe harbor and what is not?

MR. SCHWEIBENZ:  I would again, for purposes of today's argument -- I will just take them at their word, which is what we have to do for a Complaint.  Right?

They define it from this period here, Your Honor.  They have a discovery or research period before they got to pre-clinical.

So in our mind -- again, what is really critical here is a lot of the cases that Protagonist cites don't have the facts that we have, which is an issued patent.  We have an issued patent that was there when they were doing their basic research.

THE COURT:  Let me ask you this.  When they were doing their basic research, was it done for the purpose -- infringing

or not, but was it done for the purpose of developing something that would be able to treat GI-type issues?

MR. SCHWEIBENZ:  We think, based on the allegations we made here, the answer to that question is that we think that we have an allegation of infringement that is allowable, it's outside the safe harbor.  But, Your Honor --

THE COURT:  Wait a minute.  You didn't answer my question.

MR. SCHWEIBENZ:  It's a question of fact.

THE COURT:  Because it appears, just from your own exhibit, that the whole thing was about, you know, attaining fecal recovery in rats, principal exposure in various GI issues, efficacy in colitis, rats, colon macroscopic score, etc., reduce expression of IL-23 pathway cytokines.

So it's clear that even this pre-pre-clinical was aimed at doing something about this physiological condition that may affect the GI.

So at least by definition, your own highlighted paragraph of the *Merck* case, this seems to fit that.  It may be very early on.  It's pre-pre-clinical, but it's designed, you know, to create a -- eventually lead to a compound that is going to have the desired physiological effect.

MR. SCHWEIBENZ:  Your Honor --

THE COURT:  So how is that outside?  I'm still struggling with -- you are saying if it's pre-pre-clinical, no

matter how much it is purposed for obtaining some kind of medicine to treat GI issues, knowing that at some point you have to go through the FDA process and you have to do some initial very basic lab research before you even get to clinical trials, I'm not sure where you -- that's why I asked where do you draw the line?

MR. SCHWEIBENZ:  In my mind, when you see the term *reasonable belief* there, in our view, that's what we would have to probe in discovery.  For example, if their researchers were saying after they met with our client, *now we figured it out,* *now we figured out how the* -- the eureka moment happened, the light bulb went on, that is the kind of evidence that would satisfy that second condition there, that they did not form a reasonable belief.  That's what we would find out in discovery

THE COURT:  It seems to me it cuts the other way.  You are saying they formed the reasonable belief after the light went on after they got your client's confidential information and realized what a value this is to the GI field.  You may say that's a more culpable and egregious sort of theft, etc., etc. But to the extent that is probative to the question of whether there was a reasonable belief, it actually goes the other way.

MR. SCHWEIBENZ:  Without a reasonable belief, Your Honor.

THE COURT:  Yeah.  And they had a reasonable belief because of the eureka moment, thanks to the catalytic effect of

discovering and getting the confidential information.

Maybe I got it backwards.

MR. SCHWEIBENZ:  And maybe I'm not articulating it, which is likely, Your Honor, correctly.

They were doing basic scientific research.  They couldn't -- in a nutshell, they couldn't figure something out. We have an issued patent.  Therefore, at that moment in time, they were doing the scientific research.  They had not yet formed a reasonable belief about ultimately what they were doing.  Then on the timeline, they met with us.

So in that time period -- in that time period -- when they were doing the testing, that is the time period where we think there is a place --

THE COURT:  But the infringing activity would have occurred after they got the information from your client; right?  They didn't do anything with your client until they got the information.  And it's when they got that information that the eureka moment, as you put it, came to fruition, and therefore whatever belief they had became all the more strengthened so that became a reasonable belief.

I mean, that's sort of the irony.  It is a result of the infringing use, as you would claim, that they had the reasonable belief.  But the moment they had that, they had the reasonable belief.  So I don't see how they do not meet this criteria.

MR. SCHWEIBENZ:  Respectfully, Your Honor, I think that's a question of incredible degree and it's a question of fact, from our perspective.  When exactly did that occur?  How did it occur?  What do the notes say?  Again, to me that's the -- we're on the 12(b)(6) motion here, Your Honor --

THE COURT:  But the allegations -- there is no logical way out that if you say that the infringing activity occurred when they acquired the information, the secret information, and therefore misused that information and infringed upon the '150, it is that very information that gave them, at the very least, the reasonable belief that this was going to be effective in treating GI.

MR. SCHWEIBENZ:  Yeah.  I mean, again, when you look at our timeline, Your Honor -- my co-counsel just made a good point which is that there was like a window there.  There was a window of time before they ultimately filed that -- that application that was the '268 patent.  There is a three-month window there.

THE COURT:  Between filing of the '268 and what?

MR. SCHWEIBENZ:  Between the -- when they had the meeting and then also when the ultimate application was filed.  So there is a window of time there where we think it would still -- no matter how small, we think there is that window there that could satisfy the condition in the *Merck* decision.

THE COURT:  Well, what did they do in that window

period that constitutes infringing activity?

**MR. SCHWEIBENZ:**  We think they basically conducted more tests so there was tests that were there already.  Then they conducted more tests, which are reflected in the application.  So somewhere in that window, we think there is likely to be infringing activity.

**THE COURT:**  By using it in tests; is that the infringing activity?

**MR. SCHWEIBENZ:**  Making and using.

**THE COURT:**  Making and using in tests.

And are you saying that once they got this information by virtue of the meeting, they still -- even though they're making and using it in a test leading to the '268 application, they did not have a reasonable belief that this compound would cause the physiological effect of working with the GI?  You know, helping the GI issues?

**MR. SCHWEIBENZ:**  And I apologize, Your Honor, if I misheard you, but I would just say that our argument is that it's exactly as Justice Scalia posed it here within that window in terms of the second term there.  They were conducting basic scientific research and they did that without a reasonable belief.

So it's essentially that the words that are there that we think that within that window, we think that's a plausible claim of infringement based on the *Merck* case that Protagonist

has predominantly relied on for this motion.

THE COURT: All right.

What is your response?

MS. RHYU: Well, obviously the plaintiffs are changing their tune and they weren't able to point to a specific allegation of a use outside of the safe harbor.

I think it's helpful to go back and think about what the safe harbor is. This provision 271(e)(1) was passed in Congress as part of the Hatch-Waxman Act of 1984, and it was passed because there was a recognition that if companies were liable for patent infringement during the time that they're preparing regulatory documents for approval with the FDA, then the outcome would be that you would extend the life of a patent inadvertently because companies wouldn't be able to start the regulatory process until after the patent term expired. So the patent term would effectively be extended.

And so to combat that and in realization of that, the Hatch-Waxman Act allowed this protection, and the protection is for activities that lead to submissions to the FDA and submissions -- regulatory submissions.

THE COURT: How far back does that reach? So when *Merck* talks about pre-clinical --

MS. RHYU: Sure, sure.

THE COURT: What about pre-pre-clinical?

MS. RHYU: It's interesting to me how the plaintiff is

interpreting *Merck* because they are pointing you to a specific paragraph in this -- in this Supreme Court decision and ignoring the facts of that case and the holdings of that case.

And what the Court recognized was not only the recognition that the Safe Harbor was important to prevent the extension of the patent term, but also that during this regulatory period, there is a great period of uncertainty.  And I think that's on page 206, 208.

And that then even if you have clinical candidates that are -- that are showing promise, that you never really know until you've done the experimentation.  And there is no certainty to drug approval, and it's important to provide protection to the experimentation phase; otherwise, the protections of the safe harbor would be illusory.

**THE COURT:**  Well, which is why all that is required is a fairly low threshold.  Even the highlighted paragraph only requires an intent to develop a particular drug, not just something in a total vacuum, and a reasonable belief that the compound will have the hopeful effect.  That includes experimentation.  That includes, you know -- so -- but I -- so what about -- if you could address the specific argument that well, they made an allegation here that prior to the filing of the '268, after they learned of the information, this several month window period when they are doing basic, basic, basic research, there was no safe harbor protection.

**MS. RHYU:** So prior to meeting with MDL, Protagonist filed three provisional applications, which MDL actually attached to the Complaint, so the Court can consider these provisional applications. They are Exhibits B, C, and D.

And the very titles of those applications recognized that these are IL-23 inhibitors that are used to treat inflammatory bowel diseases. So these are provisional applications that were filed in advance of meeting with MDL.

**THE COURT:** So, therefore, there was an intent, even back then --

**MS. RHYU:** There was an intent. There was an understanding.

And moreover, the very molecule that they're talking about is a molecule that ultimately became a candidate for clinical development, and that's a distinction between our case and *Merck*, making our case stronger.

In *Merck*, the peptided issue was a peptide that the companies never applied for regulatory approval for. So there it was much more attenuated than our situation where they -- the compounded issue, PTG-200, is a compound that has been undergoing these pre-clinical tests and now on the cusp of Phase 1 trials. And as you noted, the Janssen Agreement is entirely about clinical development of the PTG-200 compound.

**THE COURT:** What about the claim that there was no reasonable belief prior to filing the actual '268 application

after they had gotten the information -- after Protagonist got the information from MDL, that there is that little window there where they didn't have enough of a reasonable belief or at least arguably did not have enough of a reasonable belief that the compound was going to do anything and therefore it did not enjoy the safe harbor protection during that window period?

MS. RHYU:  I just don't think that is a credible allegation in light of the provisional applications that were filed and in light of the fact that this is a company that is based on creating drugs and discovering drugs.

THE COURT:  And the provisional application did make reference to this molecule; right?

MS. RHYU:  The three provisional applications made reference to the IL-23 inhibitor pathway and the compounds that the company had been investigating in that pathway.

There are no facts in the record about our specific molecule and when that molecule was discovered, but our application that relates to that molecule relies on these provisional applications.

THE COURT:  All right.  So what is clear was that there was an intent to get to this pathway to deal with IL-23 in the area of -- to address specifically the area of certain GI conditions?

MS. RHYU:  Exactly.

THE COURT:  And under their theory that it was upon

meeting with MDL that they had this eureka moment that here, here is the key molecule -- is it PTG-200?

**MR. SCHWEIBENZ:**  Yes, Your Honor.

**THE COURT:**  -- that unlocked that and there was the -- the infringing act was taking that molecule and then using it and testing it prior to filing the '268 during that several-month period.

**MS. RHYU:**  It's not credible to say that using and testing such a molecule would be for academic purposes and not for the purposes of finding a drug that would ultimately be a candidate --

**THE COURT:**  Particularly when viewed in the context of what Protagonist was trying to do, having already submitted three provisional applications in this field?

**MS. RHYU:**  Exactly.

**THE COURT:**  And focusing on the IL-23.  So it's not plausible within --

**MS. RHYU:**  That is our argument, yes.

**THE COURT:**  -- within the meaning of *Iqbal* and *Twombly*, it's not plausible?

**MS. RHYU:**  Exactly.

**THE COURT:**  What is your response to that?  How is it plausible, given that there is a predisposition, obviously, and a campaign by Protagonist to develop a compound in this very area to treat a specific kind of disease or series of diseases

and then they meet and find out about this great molecule that holds great promise and then decide to use it and test it -- how is that not done with the intent to develop a particular drug or without a reasonable belief that this was going to be effective in treating bowel diseases?

**MR. SCHWEIBENZ:**  I think, Your Honor, the answer to that question would be because we think that the general nature of a provisional application -- which, again, Your Honor, is like a stake in the ground, that you put in the ground.  You say, *You know what?  Here is an idea, a very general idea we have.*

Then you look at the incredible amount of detail, and I'm -- again, just to emphasize, Your Honor, we're talking about four -- more than four times the number of sequences that were added.  Afterwards we think when you look at those facts, that basically it's plausible that PTG-200 -- they didn't really form the reasonable belief until after they had that meeting.

In our view, there is a window there that it's at least plausible that there could have been an act of infringement there.

And, again, our allegations are to be assumed true.  The *Merck* decision --

**THE COURT:**  But it's got to be plausible.  That's the question.

**MR. SCHWEIBENZ:** Again --

**THE COURT:** How is it plausible -- I mean, it seems self-contradictory to say they got this eureka moment. The PTG-200 that was then learned of via these meetings, which ultimately did not lead to partnership or whatever, was so important, and yet they took it and ran with it and the idea that yet they did so without a reasonable belief that it could have a beneficial effect?

**MR. SCHWEIBENZ:** I think when you look at the timeline, Your Honor, the Janssen deal occurred much later. So in terms of the commercial aspect, that is much later. We are talking about two years prior to that. We are talking about a very limited window, which we've pled. We believe obviously put them on notice of what the pleading was because we put this detailed timeline --

**THE COURT:** You would concede they had a reasonable belief by the time they filed the '268 application?

**MR. SCHWEIBENZ:** No, Your Honor. I think --

**THE COURT:** No?

**MR. SCHWEIBENZ:** No.

**THE COURT:** Well, then --

**MR. SCHWEIBENZ:** Again, there is a window -- there is a window there, Your Honor, between when our patent issued, when we had the meeting with them, and around the time that the '268 patent issued -- there is window there, Your Honor, that

we think that -- again, by their own admission, by their own admission --

THE COURT:  I'm asking you at the tail end of the window, where does that window end?  I thought your window argument assumes that by the time they actually filed the '268 app, they did have a reasonable belief.  Your argument was the window before, the several months between the meeting with your client and the filing was the window where there was no reasonable expectation.  I thought that's what I understood your argument.  And therefore there is a bookend to your argument, which is the filing of the '268.

MR. SCHWEIBENZ:  Bear with me, Your Honor.  I apologize.

Again, Your Honor, I just wanted to make clear, what -- when I was talking about the window, Your Honor, you have got a couple dates I want to keep in mind.  You have the original provisional that was filed on July -- I believe it's in their reply.  It's in July of 2014.  That's when Protagonist filed their original -- I will call it sort of the bare-bones provisional, which was in July of 2014.

THE COURT:  Yes.

MR. SCHWEIBENZ:  Then our patent issues on February 3, 2015.  We have the meeting in May of 2015.  Again, there was a series of meetings.  It wasn't just one meeting, Your Honor.  Then it's in July of 2015 that they file that application.

So --

THE COURT:  Yes.

MR. SCHWEIBENZ:  So in our view, it's -- there is a window there where we think that -- that there is a plausible argument that they didn't form a reasonable belief.

THE COURT:  What's the window?  Give me -- what are the dates of this window?

MR. SCHWEIBENZ:  That would be from February 3, 2015, Your Honor, to July 15 -- I will concede that, Your Honor. It's July 15 of 2015.

THE COURT:  Okay.

MR. SCHWEIBENZ:  I may have that off.  I don't have the '268 patent in front of me to see --

THE COURT:  All right.  But whatever the date, that's what I was asking.  The window closed by the '268 application.

MR. SCHWEIBENZ:  I just want to look at the issue date for the '268 patent.  I apologize.  I don't have that in front of me.

THE COURT:  Well, but your argument was --

MR. SCHWEIBENZ:  Your Honor --

THE COURT:  -- prior to the filing of the '268, they did all this testing and they came up with a much larger set of sequences and all this --

MR. SCHWEIBENZ:  Correct.

THE COURT:  That's when the wrongful activity

occurred.  They were using this patent and it was without protection.  And the issue boils down to did they have a reasonable belief that the compound would cause the kind of physiological effect treating inflammatory bowel disease, etc., etc., and --

MR. SCHWEIBENZ:  Right.  From our perspective, there is a plausible claim that they did not have that reasonable belief, and we think we've pled it sufficiently under *Iqbal/Twombly* for Rule 12, but we don't want to concede the point, Your Honor.  This is, of course, an affirmative defense. We think we put them on notice of it.  It's not really clear to us that *Iqbal/Twombly* and Rule 12(b)(6) apply to this argument because this is obviously a defense which they have all the information --

THE COURT:  How could they have no reasonable belief if what you say they are using is the key teaching of the '150 -- your client's '150, which was designed to deal -- to be a peptide that binds the human IL-23 receptor, inhibiting the binding of the IL-23 itself, and therefore having the therapeutic effect?  I mean, that's the whole purpose of your client's patent; right?

MS. RHYU:  Incidentally, that was published in 2013, so that was in the art.

THE COURT:  Okay.  It was not only in the art, but, I mean, the whole idea that they took the idea of the patent, the

patent had already been issued, it was out there.  You're saying -- maybe it's the wrong thing -- I don't know.  Otherwise, it would be infringing absent this -- I know there is some issues there about whether it really does infringe, but let's say it would be infringing activity to steal somebody's IP and then try to incorporate it into your own patent, perhaps.

But I don't see how you can say plausibly there was no reasonable belief this was going to have a therapeutic effect, when the thing they stole was exactly the part of the '150 patent that was designed to have that effect.

**MR. SCHWEIBENZ:**  What I want to do, Your Honor, my co-counsel, Dr. Shier -- he's got a much better handle on the technology.  I want him to explain to you the nature of our patent in terms of it's like a building-block nature versus what Protagonist is claiming in the '268 patent.

**THE COURT:**  Okay.

**MR. SHIER:**  We believe that the basis for the evolution of their PTG-200 is very squarely within the -- within the information that we provided them.  And that there is -- absent our information, that there was no way that they would have gotten to the '268.

**THE COURT:**  Okay.  Well, I understand that.  I mean, that's the whole basis for claiming an infringement here, but the legal technical issue by virtue of this safe harbor

provision as interpreted by the Supreme Court is whether or not in doing this stuff, in using your client's stuff, doing the scientific research, they had a reasonable belief that the compound would cause a beneficial therapeutic effect, and that's why I'm having trouble understanding -- given that they had filed preliminary provisional applications directed to this general issue, given the fact that the '150 itself talks about the effect on the IL-23 receptor and the ultimate therapeutic potential of that, and they are taking this, stealing it, in your view, and using it for their own test leading to, months later, the actual '268 application, how is that not done with a reasonable belief that this would have a therapeutic effect?

**MR. SHIER:**  I think there is some confusion as to the origin of the reasonable belief.  I mean, the *Merck* case -- the reasonable belief is for that compound, that that would cause that physiological effect.

What they are trying to lead the Court to believe is that just because they had a generic interest in a certain activity or certain function, that that, by definition, would give them an expectation --

**THE COURT:**  Not by definition.  That provides the backdrop for the motive and the context.  What is specific is the information they got sounded like a promising drug.  Your co-counsel called it a eureka moment.  And a eureka moment is underscored by the fact that the '150 was issued.

**MR. SHIER:** An interest in a development or a target, the IL-23, doesn't necessarily give rise to an expectation that that particular compound would have that physiological effect. In fact, as my colleague pointed out, their document that we put forth in Exhibit G shows that they tested thousands of compounds. Presumably many of those didn't work because they only presented in their original disclosure 359 sequences. The overwhelming majority of those only showed up in their ultimate non-provisional that became the '268 patent.

And so presumably the fact that they only put 114 in there with thousands of peptides omitted, they clearly couldn't have had a reasonable expectation --

**THE COURT:** Well, is that true? *Merck* seems to suggest that even if the ultimate compound does not have -- is not used, does not -- the fact that you have to allow for experimentation. So if you try 2,000 and you only use 200, does that mean the other 1800 fall out? They have no protection whatsoever?

**MR. SHIER:** The question that the *Merck* court states is whether they had a reasonable belief that that compound will cause that sort of effect.

**THE COURT:** But it also says that just because ultimately the compound doesn't work doesn't mean it falls outside the protection of the safe harbor clause. That's the whole nature of clinical trials. Let's say the whole clinical

trial fails.

MR. SCHWEIBENZ: I guess from our perspective, Your Honor, those words mean something, and clearly if you look at -- Your Honor, I wanted to point out the *Lifescan* case. It's a it post-*Merck* case from this district. It's cited in our opposition. It's Judge Davila.

And in that case, Your Honor, we have allegations that were made of making -- and Protagonist, in their reply brief, said it was only about stockpiling, but it was also making, and in that decision, again, Your Honor, in 2012, Judge Davila said, *You know what, that's a factual -- you disagree with the facts. That's normal. Let's go forward with the case.*

That's what we're saying, Your Honor. We're saying that you look at the *ISIS* case, the *ISIS Pharm* case that we cited, 2014. You look at the *Chang* case, 2014. All from the Ninth Circuit. They're saying these questions about whether something is in the safe harbor or not, post-*Merck*, those are factual determinations that should not be made, and *ISIS* and *Chang*, that was a summary judgment stage, but in the *Lifescan* case, that was a 12(c) motion, Your Honor.

So I think just from our purposes of a 12(b)(6) motion, we just don't think, with all of our statements being assumed true -- we think at this stage it's just not appropriate to make that determination because, again, we understand that Protagonist disagrees with our factual allegations. We get

that.  And -- but however because they're assumed true, these are the exact type of fact-intensive issues that the Federal Circuit and many district courts throughout the country have held both before and after *Merck* should only be resolved through normal discovery.

Your Honor, we can talk about the case management case later if we get to that, but from our perspective, I mean, this is -- this is a very different case in terms of this window. We don't understand that anyone has ever alleged this before, and from our perspective, we have very unique facts based on the admissions that have been made by Protagonist, based on the unique facts of this case, that we think merit moving beyond the Rule 12 stage.

**THE COURT:**  Let me ask you, Ms. Rhyu, to respond to Judge Davila.  Was he wrong?  Is it distinguishable?  What are your --

**MS. RHYU:**  Thank you.  I was hoping for the opportunity to address those cases that counsel mentioned.

So the *Lifescan* case is a perfect example of what is missing in this case.  In that case, it was alleged that compounds were stockpiled, so -- in anticipation of a launch. So stockpiling a product is not related to FDA submissions.

In that case, these were test strips for glucose meters called Genstrips, and the manufacturer was setting up a distribution channel.  It was alleged that the manufacturer was

setting up a distribution channel that had nothing to do with the regulatory process.  There were sales projections and actual dollar amounts associated with the stockpiled product.

He mentioned the *ISIS* case.  The *ISIS* case, again, there the allegation in the Complaint related to a platform technology well before identification of a compound where there had been no particular biological process or no particular physiological effect that had been identified in the use of this platform technology which involved the use of Antisense RNA Technology to identify key targets for drug discovery. That -- you were asking earlier where do you draw the line. That is a case, *ISIS*, where the Court drew the line and said that preliminary discovery investigative work isn't reasonably related to an FDA submission.

**THE COURT:**  So it's too far removed.  It wasn't key to any particular physiological therapy.

**MS. RHYU:**  Correct.  That is the *ISIS* case.

And then the third case that he mentioned is the *Chang* case and the *Chang* case is instructive.  There the Court denied the motion for summary judgment where there was evidence of other uses that were potentially outside the safe harbor, including evidence that there was already manufacture for uses that were not related to the FDA filing and there were also -- there was also evidence that the other uses were intended to expand the scope of the patent protection that the company had

throughout the world.

Another very important aspect of the *Chang* case was that there, the defendant had entered into an agreement with another company, TheraNova, for development, and there the court noted that that agreement would appear to fall within the safe harbor.  So that's a case where there was a license agreement and that license agreement fell within the safe harbor.

So all of the cases that they rely on --

THE COURT:  All right.  I will give you one minute to close and then I'm going to take the matter under submission.

MR. SCHWEIBENZ:  Your Honor, I didn't know if you wanted me to touch on the -- like the Janssen aspect because we have allegations there as well, or is that --

THE COURT:  Well, I have read the briefs.  If you have a critical comment that you want me to focus on in regard to the Janssen Agreement, why don't you point that out right now.

MR. SCHWEIBENZ:  Okay.  Great.

Your Honor, I guess there what I would do is point you to Exhibit J of our Complaint and specifically, Your Honor, there is the Form 8K that Protagonist had submitted to the Securities and Exchange Commission.

THE COURT:  Yep.

MR. SCHWEIBENZ:  And that, Your Honor, was filed on May 26, 2017.  And the comment there is that there is, we think, a statement there that they're not just using the

$50 million that they've already received for PTG-200.  They are using it for other things.  Related -- the quote is "related IL-23 receptor inhibitor compounds for all indications."

Then there is Exhibits K and L to our --

THE COURT:  Well, show me where.  I'm looking at it. "Upon the effectiveness of the agreement, Janssen would pay Protagonist $50 million as an initial payment."  Are you talking about that or are you talking about something else?

MR. SCHWEIBENZ:  There is a quote there on that document, Your Honor, on Exhibit J, which says, "Protagonist would grant to Janssen an exclusive" -- it's like about halfway down the page.  It says, "Protagonist would grant to Janssen an exclusive worldwide license to develop, manufacture, and commercialize PTG-200 and related IL-23 receptor inhibitor compounds for all indications."  Do you see that?

THE COURT:  Yes.  The option to provide up to -- yes.

MR. SCHWEIBENZ:  Our point is, one, there.  And then secondly in Exhibits K and L to our Complaint where you have the presentation of the CEO of Protagonist, Dr. Patel, where he says he has used the money from Protagonist -- will be used to -- essentially those resources will fund our operations until mid 2019.

So in our view, this is an acknowledgment that Protagonist is using the money received from Janssen for purposes other

than the development of PTG-200 and the proceeds of the sale are not in and of themselves reasonably related to the generation of data for submission to the FDA regarding PTG-200. That is our allegation.

In our view, those are plausible allegations and those types of allegations were upheld in the *ISIS* case at the summary judgment stage, Your Honor.  And from our perspective, those are sufficient to overcome the planned safe harbor affirmative defense of Protagonist in the context of a Rule 12(b)(6) motion.

**THE COURT:**  Let me ask Ms. Rhyu to respond.

What about that?  If some of the money is designed to go to something other than the research and obtaining FDA approval, is that not a kind of a sale or use or otherwise infringing activity?

**MS. RHYU:**  No, Your Honor.  The fact that Protagonist has decided to invest the money that they received from a transaction with Janssen where Janssen is partner and paying to co-develop the PTG-200 compound doesn't change the nature of the transaction between Janssen and Protagonist.

And the *AbTox* case from the Federal Circuit which we cited in our brief specifically addresses the point that the safe harbor does not look to the underlying purpose or the attendant consequences of the activity, and there the activity were tests that induced the sale of the patent.  Those consequences were

not considered as long as the use, the accused use is reasonably related to FDA approval, and here there can be no doubt that the Janssen/Protagonist agreement is about developing -- it's about clinical development of PTG-200.

THE COURT:  What if the agreement provided for an extraordinary amount of money that was -- clearly exceeded the cost of clinical trials, development, everything else, but was really kind of almost -- one could recharacterize that as almost an advance on profits and sales.  Is there some point where it loses its reasonable relationship by order of magnitude?  Maybe that didn't happen here.  I'm asking you for theoretical --

MS. RHYU:  I suppose theoretically, that's possible, and the question is whether there is a reasonable relationship, but as Your Honor probably understands, the cost of drug development and the amount of investment that a biotechnology company puts into drug discovery and identifying candidates to take to the FDA is so costly that the license that a pharmaceutical company pays in order to partner with a company that's identified a promising candidate, that amount could be very high and very reasonable for a worldwide exclusive license to that compound.

MR. SCHWEIBENZ:  Your Honor, if I may?

THE COURT:  Well, let me ask a follow-up question. That suggests there could be lurking in there a factual

question as to whether the compensation here was reasonably related -- because at some point, maybe it's not reasonably related.  So, for instance, rather than phasing in the $125 million payment or the later on, $200 million payment, what if they pay that all up front?  I mean, at some point would it look like an advanced sale as opposed to --

          **MS. RHYU:**  Under the facts alleged here, there is a reasonable relationship, and if this Court or any court were to look at every agreement and allow patent owners to come in before the regulatory period and challenge biotech companies who are trying to discover drugs, that would completely undermine the goals of the safe harbor and Congress in passing those protections.

          **THE COURT:**  So there is a policy reason not to subject the payment amount for these kinds of agreements, and I think you've indicated these are not uncommon to have a small company bring in a larger pharmaceutical company --

          **MS. RHYU:**  It's routine, Your Honor.  It's routine, given the cost of the clinical trials.

          **THE COURT:**  And you are saying to examine the adequacy or the allocation or the size of that compensation, when there is no indication otherwise that it is for anything but development, would set bad precedent?

          **MS. RHYU:**  Your Honor, we go back to the Supreme Court precedent on this.  And the *Merck* case says, "All uses of

patented compounds reasonably related to the process of developing information for submission under any federal law regulating the manufacture, use, or distribution of the drugs is exempted and not infringement."  "Any uses" -- I'm sorry. "All uses of patented compounds reasonably related."

This is a development agreement.  This is an agreement about all of the stages of clinical development where there are stops and opt-ins, and there can be no doubt that these are reasonably related.

THE COURT:  And the fact that this agreement is structured with these various stops and opt-ins and that the $50 million is a payment clearly tied to clinical trials and is only if, for instance, Janssen elects to maintain its license and continue the development in Phase 2B is there an additional 125?

MS. RHYU:  Correct.

THE COURT:  And then following conclusion of the Phase 2B, if it elects again to maintain the second opt-in, they get to 200, and then they get tiered royalties if this actually goes into sales?

MS. RHYU:  Right.  All conditional prospective, in the future.

THE COURT:  Okay.  What's --

MR. SCHWEIBENZ:  Your Honor, I think -- the thing that I just -- like a fundamental point here is the $50 million has

already been paid.  It's not in the future.  It's not conditional.  And the question of whether that $50 million is being used for something that's reasonably related to FDA submissions, it's not good enough for Protagonist respectfully, Your Honor, to say oh, it's routine.

Ironically here, we are the plaintiff, and what Protagonist is essentially arguing is in our Rule 12(b)(6) motion based on the safe harbor provision, the Court should accept as true the factual assertions set forth in the motion to dismiss and reply.  In other words, it's Protagonist, not MDL --

THE COURT:  How do you -- how do you deal with the *AbTox* case?  Because it's designed to provide breathing space and not subject every single co-development transaction to the kind of scrutiny, because otherwise, people get involved in litigation from day one.  As soon as a small pharmaceutical company joins up with a large pharma to help it through the FDA process, immediately it's subject to litigation.  And isn't that something that the safe harbor is designed to prevent?  So what about *AbTox*?

MR. SCHWEIBENZ:  Okay.  So that's -- that's seems to be like a policy argument.  And I understand where that comes from in the statute.  But, you know, *AbTox* is 1997.  And so in the context of the *Merck* case -- and, again, just looking at it, and I know that the argument is that this is a wide berth,

a lot of leeway is given, but moving past the Rule 12 stage in a litigation is not going to -- this parade of horribles that is going occur if we move beyond the Rule 12 stage.  There is things that we can do, Your Honor, to, I think, protect some of the concerns that Protagonist has.  There is a protective order that we would argue that should be issued in this case.  We can focus or narrow discovery, perhaps even on this safe harbor issue if Your Honor sees that as a way that we could really try to limit things --

THE COURT:  Is there anything subsequent to *AbTox* that -- you say well, it's easy to dismiss because it's 20 years old?  Is there some more recent authority narrowing, criticizing, distinguishing *AbTox* that is relevant to our discussion today?

MR. SCHWEIBENZ:  Your Honor, I am not prepared to answer that question, and I apologize, Your Honor.  I would submit -- if it's allowable, Your Honor, I would like to submit something on that.

THE COURT:  I assume it's in your brief.

MR. SCHWEIBENZ:  We actually only had one brief.  I think the *AbTox* case -- I don't think it came up until the reply, Your Honor.

In fact, I would note for the record, Your Honor, there was 12 cases that Protagonist added in the reply that were not actually in their opening motion, so for that reason,

Your Honor, it's definitely not in their opening motion.

So for the fact that they added 12 cases in the reply -- we didn't want to do a sur-reply, Your Honor, because we thought that we could just handle it at the hearing, but from our perspective, if I could, Your Honor, respectfully just have the ability to respond to your request, I would like to do that, if it's possible.

**MS. RHYU:**  Our additional cases were addressing propositions that were unexpected, such as their claim that the motion to dismiss standard was the beyond-a-reasonable-doubt standard, one that was supplanted by the *Iqbal/Twombly* cases, and arguments of the like that required a response, and they saw those cases, they have had ample time to respond to those and to be prepared to bring those arguments to this oral argument.

So I do not think that an additional submission is in order here.  They simply have not identified the use.  It goes back to the very first question that Your Honor asked.  It's not alleged.

**MR. SCHWEIBENZ:**  Your Honor, respectfully, we did allege making and using, selling and offering for sale.  So that's plainly -- and that's not what we're discussing --

**THE COURT:**  Well, normally I would not -- you've had a fair chance.  You have had today's argument.  You have had the -- to bring up any response, because otherwise we would go

on -- every time somebody cites a new case, even in a sur-reply, then that suggests the other side gets a sur-sur-sur-reply.  I'm not going to do that.

But because the law is not crystal clear on this and because of the consequential nature of this motion, because this means dismissal of your case if I grant this, I'm going to allow you within the next -- by Tuesday, if you have some authorities and very specifically on this question about whether *AbTox* is still good law and any way that you can -- if you find some distinguishing authorities, I would like to be aware of that.

And then by Thursday, I'm going to give Ms. Rhyu a chance to respond to that if you have any contrary-contrary authorities.

It's important enough that I want to make sure I'm not missing some critical circuit court case on this.  And then I will take the matter under submission at that point.

**MR. SCHWEIBENZ:**  I appreciate that.

**THE COURT:**  Therefore, I'm going to defer -- I understand there is an issue about whether we should phase -- if this case continues, whether we should phase and concentrate on the question of kind of an early summary judgment, mini claim construction, etc., etc.  But I'm going to defer that for now and concentrate on this because if I grant the motion, that will be academic at this point.

If not, otherwise we will -- I will set a further status conference in the event that this case continues and I don't grant the motion to dismiss or if there is further proceedings and we can discuss that issue, so why don't we set that maybe month and a half, forty-five days out.

Where does that put us, Betty?

**THE CLERK:**  How about March 8 at 10:30?

**THE COURT:**  All right.  March 8 for further status conference.  Meanwhile, I will take the matter under submission once I get the supplemental briefing, the last of which will be filed on Thursday.

**MR. SCHWEIBENZ:**  Can I make one more point?  In the event -- you said that denial would be the end of the case.  We just respectfully request that any denial be made without prejudice to allow us to amend our Complaint.

**THE COURT:**  That I will have to look at to see what it is that might be amended.  I understand that denial with prejudice I would have to find that any possible amendment would be futile and not possible, so I understand what the standard is.  I'll consider that.

**MR. SCHWEIBENZ:**  Thank you, Your Honor.

**MS. RHYU:**  We appreciate that.  Thank you.

**THE COURT:**  Thank you.

(Proceedings adjourned at 12:54 p.m.)

CERTIFICATE OF REPORTER

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:   Friday, January 26, 2018

*Pamela A. Batalo*
_____
Pamela A. Batalo, CSR No. 3593, RMR, FCRR
U.S. Court Reporter